**SOUTHLAND MANUFACTURING CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 71-2059.**

United States Court of Appeals, District of Columbia Circuit.

March 16, 1973.

L. Wayne Townsend, Richmond, Va., was on the brief for petitioner.

Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Baruch A. Fellner and John M. Flynn, Attys., for the N. L. R. B., were on the brief for respondent.

Before FAHY, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

PER CURIAM:

In 1966 the National Labor Relations Board issued its decision that Southland Manufacturing Corporation had violated Sections 8(a)(1), (3), and (5) by wrongfully discharging an employee, refusing to reinstate striking employees, and shutting down its plant. The Board ordered the company to pay back pay and reinstate the discriminatees. That decision was affirmed by this court in United Hatters, Cap & Millinery Workers, International Union v. NLRB, 126 U.S.App.D.C. 149, 375 F.2d 325 (1967). In 1971 the Board issued a Supplemental Decision and Order determining the amount of backpay for which Southland is liable, and this case is before us on a petition to review and set aside that determination.

Southland raises four objections to the Board's Supplemental Decision: The backpay liability was contingent upon resumption of business operations; the Board was guilty of laches in instituting the proceedings; the Board failed to show compensable loss by the discriminatees; and the Board failed to follow its own guidelines for investigating backpay losses. We find none of these warrants reversal.

█ 1. The portion of the Board's order relevant to Southland's contingency argument reads as follows:

> We shall order the Respondent, in the event it resumes its operations, to offer Crimilda Acosta and to those striking employees, who were discriminatorily discharged or denied reinstatement immediate and full reinstatement to their former or substantially equivalent positions and make all such employees whole for any loss of earnings they may have suffered by reason of the unlawful discrimination against them; backpay to run only to the date in February 1965 when the Respondent shut down its plant, the exact date to be determined at the compliance stage. We shall also require the Respondent to make whole those nonstriking employees who were unlawfully locked out from December 7, 1964 to January 11, 1965.

Southland has not resumed its operations, and it contends that the above passage makes its liability for backpay, in respect of periods both before and after its shutdown in February, 1965, contingent upon such resumption. It further notes that this court affirmed the above order, and concludes that the Board cannot now assess backpay without the occurrence of the contingency.

Each party asserts that a strict grammatical construction of the order supports its reading of the modifying clause "in the event it resumes its operations." Neither argument is compelling, although Southland's reading has some advantage insofar as purely grammatical indications of meaning are thought to be determinative. The modifying clause precedes both dependent clauses. Were it intended to modify only the "reinstatement" clause, proper placement would be within the clause. Nevertheless, this argument is not conclusive.

The court's previous reference to the order sheds little light on the contingency issue:

> The remedial order, in addition to cease and desist provisions, called affirmatively for reinstatement of certain named employees in the event the company, which at the time of the order had ceased operations, resumed operations, with reimbursement for any loss of earnings suffered as a result of the discrimination against them. . . .

375 F.2d at 326.

We did, however, note with approval the Board's reservation of the right to modify the backpay provisions as required in the future. Thus we showed no purpose in affirming the order to confine the Board to the terms of this alleged contingency in the supplemental proceedings. It does not seem rational to suppose that either the court or the Board contemplated that Southland could escape liability for backpay in respect of periods prior to its going out of business.

2. Southland's second argument is that the Board was guilty of laches in instituting the backpay proceeding. The initial order was entered on April 1, 1966, and this court issued an enforcement order on February 23, 1967. The backpay proceedings began January 21, 1971. Petitioner claims prejudice because, in the meanwhile, records were allegedly lost by petitioner, possible witnesses moved away, and the memories of former employees faded. It cites no specific examples of any of these disadvantages. It called no witnesses other than its president; therefore, the claim concerning the faded memories of former employees is questionable.

The Board answers that laches may not defeat a suit brought by the Government to enforce a public right. In any event, the Board points out that the delay is largely attributable to the intervening proceedings held to determine whether it was Southland or its alleged successor (Propper International, Inc.) which was to be held accountable for the back pay. Affirmance as to this point can rest comfortably on this last-mentioned circumstance.

3. The problem of the adequacy of the Government's proof is complicated by the sketchy nature of the hearing. Prior to the hearing the Board had, in accordance with its usual practice, filed a detailed specification of the back pay which it had found to be due each individual employee. This specification lists the employees by name and sets forth other relevant information, including the amounts of interim earnings, if any, which are deducted from the amount owing by Southland. These interim earnings are obtained by the Board from the Social Security records.

In its amended answer, Southland stated first that it could not admit or deny the accuracy of the specifications for lack of knowledge as to how the Board formulated them. It did go on to say, however, that its President, Mr. Milstein, "has knowledge of interim earnings and compensation by some of the employees named in the schedules of the specifications which are not reflected in those specifications"; and it went on to say that it expected to be able to produce records as to those alleged interim earnings and compensations at the hearing.[1]

1. It is also alleged that many of the employees had received vacation pay, and that some had received wages during the period from December 7 through December

■ It is to be noted that these allegations in the amended answer relate to interim earnings. There is no suggestion whatsoever by the defense of willful loss of earnings, which is the shorthand way of referring to the fact that an employee makes no effort to find other employment. At the hearing Mr. Milstein was the only witness for Southland. He testified about the vacation pay and December wages refered to in Note 1. He also testified that he had talked to some of the employees, and had ascertained from them that they did nothing more about seeking employment than to register with the United States Employment Service. Although the Examiner let this in over the General Counsel's objection, it obviously was improper testimony since it went to a defense not even hinted at in the amended answer. Mr. Milstein further testified that he had asked these 30-odd employees whether they had been approached by the Board for information in connection with the ascertainment of interim earnings, and that they had indicated they had not been. It is this testimony on which Southland relies in urging that the Board did not follow its own prescribed procedures.

■ This was the sum of Southland's challenge to the specifications at the hearing, and it was not of such a nature to warrant upsetting the Board's order

in this case. The Board proceeded in a proper fashion, and, by means of the specifications, put Southland clearly on notice of what the Board's investigation showed to be due to each employee in respect of back pay, taking account of interim earnings known to the Board. If Southland had any reason to challenge any one of these computations, it should have done so with a statement of why it thought it was incorrect; and, in that event, it is entirely possible that the Board might have been under the necessity of producing the employee in question or otherwise sustaining its burden of proof. See NLRB v. Rice Lake Creamery Co., 124 U.S.App.D.C. 355, 365 F.2d 888 (1966); NLRB v. Mastro Plastics Corp., 354 F.2d 170 (2d Cir. 1965). In the circumstances of this record, however, the Board was not required to have every employee present personally at the hearing to testify.[2]

■ 4. On the basis of Milstein's testimony that a few of the employees had indicated to him that the Board had not approached them directly about interim earnings, Southland alleges that the Board failed to follow its own investigatory procedures in this case. That evidence standing alone is insufficient to require disturbance of the Board's order.

The Petition for Review is Denied.

21, 1964, and that, as to these matters, Southland expected to be able to produce probative records at the hearing. The Board found ultimately—and we agree—that, as to these particular claims, Southland did not carry its burden of proof. See footnote 4 of the Board's Supplemental Decision and Order.

2. *Rice Lake* and *Mastro Plastics* involved the issue of willful loss of earnings, a defense not raised in the pleadings in this case. Although the reasoning of those decisions may apply to the question of interim earnings as well, we reserve that question for consideration in a case where the defense of interim earnings has been asserted with the requisite specificity.